1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  DAVID C. WALTON (167268)
   655 West Broadway, Suite 1900
3  San Diego, CA  92101
   Telephone:  619/231-1058
4  619/231-7423 (fax)
   davew@rgrdlaw.com
5
   JOHNSON & WEAVER, LLP
6  FRANK J. JOHNSON (174882)
   PHONG L. TRAN (204961)
7  600 West Broadway, Suite 1540
   San Diego, CA  92101
8  Telephone:  619/230-0063
   619/255-1856 (fax)
9  frankj@johnsonandweaver.com
   phongt@johnsonandweaver.com
10
   Attorneys for Plaintiff
11

12            UNITED STATES DISTRICT COURT

13            CENTRAL DISTRICT OF CALIFORNIA

14                 SOUTHERN DIVISION

| | |
|---|---|
| 15  MARK MALAK, Individually and on ) | Case No. 8:17-cv-00138 |
| Behalf of All Others Similarly Situated, ) | |
| 16                                       ) | CLASS ACTION |
|               Plaintiff,                 ) | |
| 17                                       ) | COMPLAINT FOR VIOLATION OF |
|         vs.                              ) | THE FEDERAL SECURITIES LAWS |
| 18                                       ) | |
| BANC OF CALIFORNIA, INC.,                ) | |
| STEVEN A. SUGARMAN and JAMES )            | |
| 19  J. McKINNEY,                         ) | |
|                                          ) | |
| 20              Defendants.              ) | DEMAND FOR JURY TRIAL |
| 21  _____  ) | |

22

23

24

25

26

27

28

Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Banc of California, Inc. ("Banc" or the "Company"), as well as Company press releases and conference call transcripts and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

3.      Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b). Banc maintains its headquarters in this District and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

4.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE").

## INTRODUCTION

5.      This is a securities class action on behalf of all persons who purchased Banc publicly traded securities between October 29, 2015 and January 20, 2017, inclusive (the "Class Period"), seeking to pursue remedies under the 1934 Act. These

1  claims are asserted against Banc and certain of its current and former officers and/or

2  directors who made materially false and misleading statements during the Class

3  Period in press releases and filings with the SEC.

4     6.     Banc is a financial holding company operating in commercial banking,

5  mortgage banking, financial advisory and corporate banking.

6     7.     Throughout the Class Period, defendants violated the federal securities

7  laws by disseminating false and misleading statements to the investing public.  As a

8  result of defendants' false statements, Banc's stock traded at artificially inflated prices

9  during the Class Period, reaching a high of $23.12 per share on August 8, 2016.

10     8.     On October 18, 2016, an article was published by *Seeking Alpha* that

11  highlighted Banc's ties to alleged fraudsters.  The article stated in part:

12         In 2010, COR Capital ("COR"), an obscure investment firm most

13     visibly known for its associations with Pink-Sheet stocks, led the

14     recapitalization of a Los Angeles based regional bank named First

15     Pactrust ("FPB").   In 2012, Steven Sugarman, COR's Managing

16     Member, became the CEO of the bank and began a "transformational"

17     growth strategy fueled by a combination of (oftentimes related party)

18     acquisitions and loan growth.

19         Growing its balance sheet by a factor of 10x and now having

20     crossed the critical $10 Billion asset threshold, the renamed Banc of

21     California (NYSE:BANC) has touted itself as a "community

22     reinvestment" lender.   The bank has cultivated relationships with

23     politicians and celebrities to project an air of success and credibility as

24     California's Bank.   Investors have increasingly adopted these

25     promotional narratives and BANC's shares had doubled over the past

26     year.

27         The PR effort hit new highs in August when BANC agreed to pay

28     $100 million, roughly 10% of its market cap, for soccer stadium naming

rights to the LA Football Club (which just happens to be part-owned by Steven's brother Jason Sugarman and Jason's father-in-law Peter Guber).

With our interest piqued by yet another related party transaction, we conducted exhaustive due diligence into BANC's leadership team, collecting tens of thousands of pages of publicly-available state, federal, and international documents.  Taken together, these form to assemble one of the most ominous fact patterns we have ever seen.

Our research establishes that BANC's senior-most officers and board members have a broad mosaic of extensive and indisputable ties to Jason Galanis.  We believe this introduces a significant un-discounted risk that notorious criminals gained control over the $10 Billion taxpayer guaranteed Banc of California.

Jason Galanis and his infamous father, John Galanis, have a long history of secretly gaining control of banks and public companies via front men, looting assets, and leaving unsuspecting investors and taxpayers with hundreds of millions in losses.  The mere presence of a bank leadership team associated with Galanis should send diligent investors running for the hills.

                         *        *        *

**Undisclosed Ties To Galanis**.

Our research has firmly established that BANC's CEO, Vice-Chairman, Lead Independent Director, and Founding Shareholder all have extensive undisclosed ties to Jason Galanis.  The fact that Gerova entities even transferred real estate assets to BANC executives (through Camden) makes the similarities particularly acute.

9.      On this news, the price of Banc stock fell $4.61 per share, or 29%, to close at $11.26 per share on volume of 17.2 million shares on October 18, 2016.

10.    In response to the *Seeking Alpha* article, on October 18, 2016, Banc issued a press release announcing that the Company was aware of the *Seeking Alpha* allegations and that the Board of Directors had initiated a "thorough" and "independent" investigation through "Disinterested Directors."

11.    Then, on January 23, 2017, Banc issued a press release announcing the resignation of its Chief Executive Officer ("CEO") and Chairman of the Board, defendant Steven A. Sugarman ("Sugarman").    Additionally, the press release revealed that the SEC had opened a formal order of investigation directed at certain of the issues that Banc's Special Committee was reviewing concerning the Company's response to the October 18, 2016 *Seeking Alpha* article in which Banc had mischaracterized the investigation into *Seeking Alpha*'s allegations.

12.    As a result of this news, the price of Banc stock dropped $1.50 per share to close at $14.65 per share on January 23, 2017, a decline of 9% on volume of nearly 6.5 million shares.

13.    As a result of defendants' false statements, Banc securities traded at artificially inflated prices during the Class Period.    However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending the Company's share price down and causing economic harm and damages to members of the Class (as defined below).

## THE PARTIES

14.    Plaintiff Mark Malak purchased Banc securities during the Class Period as set forth in the attached certification and was damaged thereby.

15.    Defendant Banc is a financial holding company organized under the laws of the United States with its principal executive offices located at 18500 Von Karman Avenue, Suite 1100, Irvine, California 92612.  The Company's stock is traded under the ticker "BANC" on the NYSE, an efficient market.

16.    Defendant Sugarman was, at all relevant times, President, CEO and Chairman of the Board of Banc.

17.     Defendant James J. McKinney ("McKinney") was, at relevant times, Chief Financial Officer ("CFO") of Banc.  McKinney joined Banc in September 2015 and announced his resignation on September 20, 2016.

18.     The defendants referenced above in ¶¶16-17 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, false statements that caused the prices of Banc securities to be artificially inflated during the Class Period.

19.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Banc's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

**FRAUDULENT SCHEME AND COURSE OF BUSINESS**

20.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Banc.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Banc securities was a success, as it: (i) deceived the investing public regarding Banc's prospects and business; (ii) artificially inflated the prices of Banc securities; and (iii) caused plaintiff and other members of the Class to purchase Banc securities at artificially inflated prices.

**SCIENTER ALLEGATIONS**

21.    During the Class Period, the defendants had the motive and opportunity to commit the alleged fraud. Defendants also had actual knowledge of the misleading statements they made and/or acted in reckless disregard of the true information known to them at the time. In doing so, the defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Banc securities during the Class Period.

**BACKGROUND**

22.    The Company is a bank holding company operating in commercial banking, mortgage banking, financial advisory and corporate banking.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD**

23.    On October 29, 2015, Banc issued a press release announcing its third quarter 2015 financial results. The release stated in part:

> "The third quarter was highlighted by strong core deposit growth and accelerating loan originations in our commercial banking segment," said Steven Sugarman, Chairman and Chief Executive Officer. "We are especially pleased with the growth of noninterest bearing deposits during the quarter which reflect our team's success growing and deepening client relationships."

> The Company's consolidated assets totaled $7.3 billion at September 30, 2015, an increase of $0.8 billion compared to the prior quarter, and an increase of $2.7 billion compared to a year ago. Return on average assets for the third quarter was 0.9%, and return on average tangible common equity was 12% for the third quarter.

> "The third quarter results mark the sixth straight quarter since the reorganization of our bank's Board of Directors and management team in which the Company has executed consensus earnings estimates, and we

are on pace to exceed analysts' full year 2015 consensus earnings estimates," Mr. Sugarman continued. "The Board and executive management team have set preliminary targets for 2016 that include earnings per share growth of 15%, return on average assets of 1% and return on tangible common equity of 15%. Additionally, in light of the benefits of scale we are beginning to see throughout the business, we are lowering our efficiency ratio target for 2016 by 5% to 65-70%."

24.     After releasing its third quarter 2015 financial results, on October 29, 2015, Banc held a conference call for analysts, media representatives and investors during which defendant Sugarman represented the following:

We at Banc of California are proud to have partnered with California, its diverse businesses, entrepreneurs and homeowners to support and benefit the state's bright economic future. Our goal is to serve California, its thriving communities and great customers effectively and consistently throughout the spectrum of market and business cycles. We seek to empower our client streams. We're excited by our prospects and our 1,600 employees work hard every day to exceed our customer and ultimately our investor expectations.

*     *     *

The strength and stability of earnings is even more impressive given that over the past six quarters we have continued to invest in and grow the Company from $4 billion in assets to $7.3 billion today. These financial returns put us on track to deliver against our run rate targets of 1% return on assets and 15% return on tangible common equity by year-end. We are laser focused on delivering on these commitments we have made to our stakeholders. We believe one of the most important thing[s] we can do is to do what we say we're going to do. This holds true not

only for our shareholders, but for our clients, communities and employees as well.

* * *

As California's bank, we feel it is imperative to be at the leading edge of community reinvestment and you can see our commitment through our expanded locations, products and services. This is a core part of our value proposition and is a key factor in our strong deposit growth.

California's depositors want a bank that lends deposits back to the communities from which they came, financing the engines of economic and job growth throughout California. They want a bank that strengthens the communities in which they live through volunteerism and investments and they want a bank that it can be proud to partner with.

I continue to be surprised that so many banks decided not to pursue an outstanding community development program. As we have demonstrated, it is an achievable goal, complements financial objectives and can go hand in hand with accelerating financial performance.

25.     On January 28, 2016, Banc issued a press release announcing its fourth quarter and full year 2015 financial results. The release stated in part:

"Banc of California finished 2015 with accelerating growth and profitability across our businesses," said Steven Sugarman, Chairman and Chief Executive Officer. "Our return on tangible common equity over 15% and return on assets over 1% demonstrates the long-term earnings power of our franchise. Combining these returns with our industry leading growth continues to yield significant value creation for shareholders. Our strong results are a testament to the hard work and dedication of our talented employees, who as employee-shareholders

take pride in the shared success in growing the long-term value of the
franchise.  I am also particularly proud that Banc of California ranked #1
for total shareholder return in 2015 of all west coast banks included on
Forbes Magazine's list of America's Top 100 banks."

26.    After releasing its fourth quarter and full year 2015 financial results, on
January 28, 2016, Banc held a conference call for analysts, media representatives and
investors during which defendant Sugarman represented the following:

Banc of California saw tangible evidence of accelerating success
in growing our franchise value in 2015.  This was reflected in the
Company's ability to generate over $100 million in pre-tax profits for the
year.  Resulting in an increase of nearly 300% from a year earlier.
Consistent with our guidance, we finished the year with an ROA of 1%
and an ROTCE of 17% in the fourth quarter.

These strong results led [to] the Banc of California being
recognized as one of America's Top 100 Banks by Forbes Magazine this
month.  On that list, we ranked number four in terms of total shareholder
return in 2015 and I'm proud to say that we were number one amongst
West Coast banks in terms of total shareholder return.  These
accomplishments are a result of the strategic investments the Company
has made over the last two plus years, since I took the helm as CEO of
our Bank during the fourth quarter of 2013. ***I am thankful to our strong
and independent Board of Directors for providing the Company the
capital, the strategic oversight and the resources needed to build
California's top performing bank in terms of total return to
shareholders in 2015***.[1]

---

[1]    Emphasis has been added herein unless otherwise noted.

27.    On March 3, 2016, Banc announced the pricing of its offering of 4,850,000 shares of its voting common stock at a public offering price of $14.50 per share, for gross proceeds of $70,325,000.

28.    On April 15, 2016, Banc filed with the SEC its Schedule 14A Proxy Statement, which was signed by defendant Sugarman and Lead Independent Director Chad T. Brownstein.  In the "Transactions with Related Persons" section, the Proxy Statement referred to several agreements with Jason Sugarman, the brother of defendant Sugarman, including:

Consulting Services to Palisades.    The Company acquired Palisades on September 16, 2013.  Effective as of July 1, 2013, prior to the Company's acquisition of Palisades, Palisades entered into a consulting agreement with Jason Sugarman, the brother of the Company's and the Bank's Chair, President and Chief Executive Officer, Steven A. Sugarman.  Jason Sugarman provides advisory services to financial institutions and other institutional clients related to investments in residential mortgages, real estate and real estate related assets and Palisades entered into the consulting agreement with Jason Sugarman to provide these types of services.  The consulting agreement is for a term of 5 years, with a minimum payment of $30 thousand owed at the end of each quarter (or $600 thousand in aggregate quarterly payments over the five-year term of the agreement).  These payments do not include any bonuses that may be earned under the agreement.  For the years ended December 31, 2015, 2014 and 2013 base and bonus amounts earned by Jason Sugarman under the consulting agreement totaled $30 thousand, $1.2 million, and $121 thousand, respectively. Effective as of March 26, 2015, the bonus amount earned by Jason Sugarman for consulting services he provided during the year ended December 31, 2014 was credited in satisfaction and full discharge of all then currently accrued

but unpaid quarterly payments as well as any future quarterly payments specified under the consulting agreement, but not against any future bonuses that he may earn under the consulting agreement. The consulting agreement may be terminated at any time by either Palisades or Jason Sugarman upon 30 days prior written notice. Following the Company's acquisition of Palisades, the consulting agreement with Jason Sugarman was reviewed as a related party transaction and approved by the Compensation, Nominating and Corporate Governance Committee and approved by the disinterested directors of the Board.

29.     On April 21, 2016, Banc issued a press release announcing its first quarter 2016 financial results. The release stated in part:

"Based on total shareholder return since the beginning of 2015, Banc of California is the #1 performing bank stock amongst Forbes' Magazine's list of America's Top 100 Banks," said Steven Sugarman, Chairman and Chief Executive Officer of Banc of California. "In the first quarter of 2016 alone, Banc of California's 21% return outperformed the next closest bank by 7%. As all our employees are shareholders, we are proud and excited by this accomplishment. The continued strength of our financial performance showcases our strategy, focus and execution quarter-over-quarter as we are winning market share and top talent. Banc of California is a business built for the long-term."

\*        \*        \*

"Banc of California has meaningfully deleveraged and simplified its balance sheet, increased its liquidity and streamlined its businesses and organizational structure during 2016," said James McKinney, Chief Financial Officer of Banc of California. "We expect these actions will not only make us a safer and stronger financial institution, but they will be accretive to the holders of our debt, preferred stock and common

1    stock.  These actions are part of our strategy to strengthen, and increase

2    the durability of, our balance-sheet and liquidity in advance of our

3    growth beyond $10 billion in assets.   We will continue to seek

4    opportunities to strengthen our franchise for the benefit of all our clients

5    and other stakeholders."

6        30.    After releasing its first quarter 2016 financial results, on April 21, 2016,

7  Banc held a conference call for analysts, media representatives and investors during

8  which defendant Sugarman represented the following:

9        We believe we are in the midst of a secular realignment of top

10       banking talent from which Banc of California is uniquely well positioned

11       to take advantage of.  The addition of talented individuals and teams

12       such as these further validates that our value proposition is taking hold

13       and driving increasing market share gains.

14       As California's bank, our value proposition differentiates itself

15       from banks owned or managed out of state or out of country.

16       California's diverse clients and most talented employees appear

17       increasingly clear in their preference for California's bank.

18                              *        *        *

19       As always, we continue to ensure that our governance, corporate

20       structure, policies, and strategic planning best positions us for success.

21       This process has been a heightened focus, given our approaching $10

22       billion in assets.  To that end, during 2016, we liquidated PTB Property

23       Holdings LLC and announced the sale of the Palisades Group.

24       This leaves our bank as the only subsidiary of our holding

25       company and simplifies our organizational structure and therefore

26       simplifies regulatory considerations at the holding company level.  Also,

27       we have simplified our capital structure and delevered our balance sheet

28       by paying off $42 million of SBLF and $85 million of senior debt.

- 12 -

31.    On July 21, 2016, Banc issued a press release announcing its second

quarter 2016 financial results.  The release stated in part:

>    "Our strong second quarter performance is the direct result of our
>    differentiated value proposition as California's Bank.  Based on total
>    shareholder return since the beginning of 2015, Banc of California is the
>    #1 performing bank stock amongst Forbes' Magazine's list of America's
>    Top 100 Banks," said Steven Sugarman, Chairman and Chief Executive
>    Officer of Banc of California.  "Banc of California's scale as a $10
>    billion bank is enabling the achievement of our long-term financial
>    targets.  This includes a return on tangible common equity over 15% and
>    a return on assets over 1%.  We are proud of these accomplishments.
>    The consistent and strong financial performance showcases our strategy,
>    focus and execution quarter-over-quarter.  We are winning market share
>    and we are winning top talent.  Banc of California is a business built for
>    the long-term."

32.    After releasing its second quarter 2016 financial results, on July 21, 2016,

Banc held a conference call for analysts, media representatives and investors during

which defendant Sugarman represented the following:

>    To all our investors who entrusted us with their capital over the
>    past several years, our announcement is a sign that their confidence in us
>    was not misplaced and that our strategy is on track.  I want to thank each
>    of them again today for their confidence in the Banc of California vision.
>
>    With the support of key investors and our Board of Directors, we
>    have built what is now the only midsized bank focused on California.
>    We have distinguished ourselves from peers based on our size and our
>    California focus, and we are thrilled to be so well positioned to serve
>    what we believe is the most attractive banking market in the country,
>    California.

1      33.    On September 7, 2016, *Bloomberg News* published an article on Banc

2 highlighting several related-party transactions.  The article stated in part:

3        Ten years ago Steven Sugarman, a former Lehman Brothers investment

4        adviser, co-wrote a book on how to avoid stock losses.  One of its top

5        tips: "Beware of companies run by family and friends."

6           Now, Sugarman is chief executive officer of the fastest-growing

7        publicly traded U.S. Bank – a lender exhibiting some of the red flags

8        listed in his book.  Banc of California is riding high enough to pay $100

9        million for the naming rights on Los Angeles's new soccer stadium, one

10        of the richest prices ever in Major League Soccer.  Sugarman's brother is

11        a minority investor in the team, marking the latest in a series of deals

12        involving the CEO's family and associates.

13                       *       *       *

14 **Warning Signs**

15           The soccer club and its partners aim to privately finance the $350

16        million stadium, according to the team's website.  Banc of California's

17        $100 million contribution, described by people with knowledge of the

18        deal, exceeds the lender's combined profits for 2014 and 2015.  The

19        company has promised to pay it over 15 years, the people said.

20           Such transactions, even when disclosed, should serve as warning

21        signs for investors when deciding whether to buy the stock, said William

22        Black, a former regulator who's now an economics and law professor at

23        the University of Missouri-Kansas City.

24           "These kinds of conflicts of interest, we have known for millennia,

25        are associated with a dramatically increased risk of failure, and an

26        amazingly increased risk of loss upon failure," said Black, who worked

27        at the Office of Thrift Supervision in the 1990s.

28

1  Sugarman had this to say in his book: "Disclosure does not cleanse
2  the problems associated with conflicts of interest.  It simply alerts
3  investors that there may be trouble down the road."

4  Tip No. 3: "Take a close look at who's in charge."

5  Sugarman, a former McKinsey & Co. consultant with degrees
6  from Dartmouth College and Yale Law School, left Lehman Brothers in
7  2005, helped start a hedge fund and wrote "The Forewarned Investor"
8  with a colleague.  In 2010, he was part of an investor group that injected
9  $60 million into First PacTrust Bancorp, helping it repay a government
10  bailout.  Two years later, the firm announced Sugarman would co-run
11  the company alongside then-CEO Gregory Mitchell, who resigned a
12  month later.

13  *    *    *

14  For example, Banc of California bought a business belonging to a board
15  member, which helped him repay a debt to Sugarman's family.  And the
16  lender bought another business that had just hired Sugarman's brother.

17  *    *    *

18  While consulting for the bank, Jason Sugarman was working for
19  an insurance company.  That firm, according to the Securities and
20  Exchange Commission, was controlled by California financier Jason
21  Galanis, who has been arrested twice in the past year.  He pleaded guilty
22  in July to manipulating markets and said he's innocent of separate
23  charges that he stole money raised by selling bonds on behalf of an
24  American Indian tribe.  Hugh Dunkerley, a director at one of Steve
25  Sugarman's personal holding companies until last year, also was charged
26  in the tribal bond scam.  He pleaded not guilty.

27  The Sugarmans weren't accused of any involvement in the alleged
28  scam, Steven Sugarman said his company had no role, and there's no

- 15 -

1    direct link between Galanis and the bank or its CEO.  Lawyers for

2    Galanis and Dunkerley declined to comment on the pending case.

3    34.    Within a week of this article, Banc's stock price dropped from $22.26 per

4    share to below $21.00 per share.

5    35.    On September 20, 2016, the Company announced that defendant

6    McKinney had given notice of his resignation after just one year on the job.  Within

7    one week of this news, Banc's stock price would decline from $20.51 per share to

8    $17.61 per share.  The Company also announced it was consolidating its Office of

9    Finance organization under J. Francisco A. Turner and Brian Kuelbs.  The press

10    release announcing the change stated in part:

11         "We are pleased to be able to consolidate the Office of Finance

12         under the strong leadership of Francisco Turner and Brian Kuelbs," said

13         Steven Sugarman, Chairman and Chief Executive Officer of Banc of

14         California.  "Fran has distinguished himself over this tenure with the

15         Company by leading our M&A, capital offerings and strategic planning

16         activities.  Under his leadership, Banc of California has successfully

17         transformed its balance sheet to a strong commercial banking franchise

18         driven by recurring spread income.  Meanwhile, Brian has built a

19         dominant securities, treasury and capital markets team that has increased

20         the level and predictability of the bank's earnings, strengthened the

21         bank's liquidity and meaningfully contributed to the quality and rigor of

22         or analytics."

23    36.    Throughout the Class Period, defendants violated the federal securities

24    laws by disseminating false and misleading statements to the investing public.  As a

25    result of defendants' false statements, Banc's stock traded at artificially inflated prices

26    during the Class Period, reaching a high of $23.12 per share on August 8, 2016.

27    37.    On October 18, 2016, an article was published by *Seeking Alpha* that

28    highlighted Banc's ties to alleged fraudsters.  The article stated in part:

- 16 -

In 2010, COR Capital ("COR"), an obscure investment firm most visibly known for its associations with Pink-Sheet stocks, led the recapitalization of a Los Angeles based regional bank named First Pactrust ("FPB").    In 2012, Steven Sugarman, COR's Managing Member, became the CEO of the bank and began a "transformational" growth strategy fueled by a combination of (oftentimes related party) acquisitions and loan growth.

Growing its balance sheet by a factor of 10x and now having crossed the critical $10 Billion asset threshold, the renamed Banc of California (NYSE:BANC) has touted itself as a "community reinvestment" lender.    The bank has cultivated relationships with politicians and celebrities to project an air of success and credibility as California's Bank.    Investors have increasingly adopted these promotional narratives and BANC's shares had doubled over the past year.

The PR effort hit new highs in August when BANC agreed to pay $100 million, roughly 10% of its market cap, for soccer stadium naming rights to the LA Football Club (which just happens to be part-owned by Steven's brother Jason Sugarman and Jason's father-in-law Peter Guber).

With our interest piqued by yet another related party transaction, we conducted exhaustive due diligence into BANC's leadership team, collecting tens of thousands of pages of publicly-available state, federal, and international documents.    Taken together, these form to assemble one of the most ominous fact patterns we have ever seen.

Our research establishes that BANC's senior-most officers and board members have a broad mosaic of extensive and indisputable ties to Jason Galanis.    We believe this introduces a significant un-discounted

- 17 -

risk that notorious criminals gained control over the $10 Billion taxpayer guaranteed Banc of California.

Jason Galanis and his infamous father, John Galanis, have a long history of secretly gaining control of banks and public companies via front men, looting assets, and leaving unsuspecting investors and taxpayers with hundreds of millions in losses. The mere presence of a bank leadership team associated with Galanis should send diligent investors running for the hills.

                              *       *       *

A summary of key research conclusions we are releasing in this report include:

• **Jason Galanis Controlled COR, BANC's Founding Shareholder**. SEC documents detail how Galanis gained control of COR portfolio companies to orchestrate the Tribal Bonds Ponzi Scheme. Galanis laid claim to Banc of California to display his financial wherewithal and even managed the scheme out of an office in the same building as BANC's headquarters.

• **An Off-Balance Sheet Lender Controlled By BANC's Senior-Most Officers Financed Galanis**. Steven Sugarman holds an undisclosed interest in Camden Capital, an off-balance sheet lender controlled by BANC's Vice Chairman, Jeffrey Seabold. Camden was used to finance Galanis amidst the recent Tribal Bond Scheme and engaged in transactions with Galanis during the Gerova Financial fraud.

• **BANC's Lead "Independent" Director Has Strong Ties To Galanis**. BANC's Lead "Independent" Director, Chad Brownstein, has strong ties to Jason Galanis, his indicted associates, and COR Capital. Mr. Brownstein also accepted an undisclosed loan from Camden that is

secured by his Los Angeles Mansion but appears to finance his outside business ventures.

•    **We See Similarities Between BANC And Galanis' Gerova Financial fraud**.   In wrapping BANC in the flag of "community reinvestment", Steven Sugarman has recycled a nearly identical narrative to what Galanis propagated at Gerova Financial.   Further parallels include a leadership team and founding shareholder with undisclosed ties to Galanis, a bevy of suspect related party transactions, and the use of opaque assets as regulatory capital.

*       *       *

Two troubling ties to Steven Sugarman, who remains the Managing Member of COR Capital, immediately emerged:

•    Hugh Dunkerley, a former COR-executive, was indicted along with Galanis as being a key alleged player in the fraud.  Mr. Dunkerley's involvement in the scheme dates back to 2013, when he incorporated Valor while still at COR.

•    Jason Sugarman, is the Founder, Chairman & CEO of Valor (according to both an SEC filing and an interview).   During the same period, Jason served as a paid BANC consultant and continues to be described as an advisor.  (Note: Jason Sugarman was not named in the complaint or accused of wrongdoing.)

*       *       *

**We believe Jason Galanis Controlled COR**.

Our belief is directly supported by the aforementioned SEC enforcement attorney's declaration (below) which states it was "understood that Galanis was associated with COR Capital.["]

*       *       *

Galanis' demonstrated control over COR's portfolio companies combined with his physical presence at BANC's headquarters building, introduces the material risk that Galanis also gained control of Banc of California. This risk is amplified by the trail of indisputable ties between BANC's senior-most officers and Jason Galanis.

**An Off-Balance Sheet Lender Controlled By BANC's Senior-Most Officers Financed Galanis.**

In May 2013, BANC acquired an option to purchase a mortgage lender, CS Financial ("CS"), from then Board Member, Jeffrey Seabold. As part of the deal, Mr. Seabold stepped down from the board to become BANC's Chief Lending Officer (and was subsequently promoted to Vice Chairman). In 2014, BANC exercised the option to acquire CS for $10 Million.

Two former affiliates of CS, Camden Capital Partners ("Camden") and Camden Escrow, were not acquired by BANC. In fact, Mr. Seabold's initial employment agreement specifically carved out his ability to continue to direct these outside companies but restricted him from serving as a loan officer (curiously, this restriction was lifted in Mr. Seabold's 2015 amended agreement).

We found that Steven Sugarman holds an undisclosed interest in Camden Capital and its managed real estate entity, Camden Real Estate Opportunity Fund I, LLC. A May 2015 reconveyance document obtained from the L.A. County Deed Records, signed by Jason Sugarman and Jeffrey Seabold, lists JAS Partners I, LLC as a managing member of Camden.

*     *     *

1  **Undisclosed Ties To Galanis**.

2       Our research has firmly established that BANC's CEO, Vice-

3  Chairman, Lead Independent Director, and Founding Shareholder all

4  have extensive undisclosed ties to Jason Galanis.  The fact that Gerova

5  entities even transferred real estate assets to BANC executives (through

6  Camden) makes the similarities particularly acute.

7  **Shared Promotional Narratives and Associations With Politicians**.

8       In wrapping BANC in the flag of "community reinvestment,"

9  Steven Sugarman has recycled a nearly identical narrative to what

10  Galanis propogated at Gerova Financial.

11       In the below email exchange (provided below and publicly filed as

12  part of litigation), a Gerova-affiliated executive explains to Galanis that

13  they need to "get support at Mayoral and Councilman level" and states

14  "we need to pitch that we are there to help build and revitalize

15  communities and neighborhoods . . . this should be a great platform for

16  some councilman to look really good in the community."

17  (Emphasis omitted.)

18       38.    In response to the *Seeking Alpha* article, on October 18, 2016, Banc

19  issued a press release, entitled "Banc of California Update," which stated in part:

20       Banc of California, Inc. today announced it is aware of allegations

21       posted in a financial blog.  The Company's Board of Directors has been

22       aware of matters relating to Jason Galanis including certain claims he

23       had made suggesting an affiliation with members of the Company, its

24       Board, and/or its Executive team.  ***The Board***, acting through its

25       ***Disinterested Directors***, immediately initiated a thorough ***independent***

26       ***investigation*** led by Winston & Strawn, and has received regular reports

27       including related to regulatory and governmental communications over

28       the past year.

The complaint filed by the Department of Justice against Mr. Galanis and others dated May 9, 2016, . . . clearly states that Mr. Galanis' claims to be affiliated with COR Capital were fraudulent.  See paragraphs 40 and 41 of the Sworn Statement of the Special Agent of the Federal Bureau of Investigation which states:

"40.   Based on my conversation with a representative of COR Capital, I have learned that, contrary to the representations made in the June 3, 2014 email sent by JASON GALANIS, the defendant, to MICHELE MORTON, the defendant, (referenced in paragraph 39c above), Burnham, CORFA and Wealth-Assurance AG were not affiliates of COR Capital.

41.   Based on my review of documents, I have learned that on June 3, 2014, JASON GALANIS, the defendant, sent an email to BEVAN COONEY, the defendant, which forwarded the email JASON GALANIS sent to MICHELLE MORTON, the defendant, earlier that same day, attaching the description of COR Capital which fraudulently asserted that certain entities were affiliates of COR Capital.  In JASON GALANIS's email to COONEY, JASON GALANIS wrote "whoring it out shamelessly[.]   thank you [first name of COR Capital representative.]"

Banc of California and its Disinterested Directors will make further facts publicly available as appropriate.

39.   On November 16, 2016, Banc issued a press release announcing a delay in the filing of its third quarter 2016 Form 10-Q with the SEC in order to allow the Company's Special Committee to finish its investigation "into certain purported improper relationships and related party transactions and related matters."

40.   Then, on January 23, 2017, Banc issued a press release announcing the resignation of defendant Sugarman.  The Company subsequently issued a press release

1  entitled "Banc of California Board Provides Update on Independent Investigation;
2  Plans Improvements to Corporate Governance Policies."  The release stated in part:

3       Banc of California, Inc. (the "Company") today issued the following
4       update on the independent investigation into previously disclosed
5       blogger allegations.

6       Robert D. Sznewajs, current Chair of the Joint Audit Committee
7       and new Chairman of the Board said: "The matters which were the
8       subject of the Special Committee investigation do not bear upon the
9       Company's operating results or financial condition, and Banc of
10      California remains well positioned to continue to fulfill its mission and
11      vision as California´s Bank."

12      On October 18, 2016, an anonymous blog post raised questions
13      about related party transactions and other issues with respect to the
14      Company. As previously disclosed, in response to these allegations, the
15      Board formed a Special Committee which commenced a process to
16      review the allegations. Shortly thereafter, on October 27, 2016, the
17      Company's independent auditor, KPMG, sent a letter to Mr. Sznewajs in
18      his capacity as Chair of the Company's Joint Audit Committee (the
19      "KPMG Letter") raising concerns about allegations of "inappropriate
20      relationships with third parties" and "potential undisclosed related party
21      relationships."

22      On October 30, 2016, the Special Committee retained
23      WilmerHale, a law firm with no prior relationship with the Company, to
24      conduct an independent investigation to address certain issues raised by
25      the blog post, as well as questions raised by the KPMG Letter. In
26      accordance with the KPMG Letter, WilmerHale will make a final report
27      to the Special Committee and KPMG on the results of its investigation.

28

The Special Committee expects that this final report will take place within weeks.

While certain work remains to be completed, to date WilmerHale's inquiry has not found any violation of law. In addition, contrary to the claims in the blog post, the inquiry has not found evidence that Jason Galanis has any direct or indirect control or undue influence over the Company. Furthermore, the inquiry has not found evidence establishing that any loan, related party transaction, or any other circumstance has impaired the independence of any director.

Through the inquiry, however, the Special Committee has determined that a press release issued on October 18, 2016 contained inaccurate statements. In that press release, the Company stated that the "Board of Directors, acting through its Disinterested Directors" had, as of October 18, 2016, investigated issues raised in the blog post. This press release was inaccurate in certain respects. The review established that although an investigation had been conducted, it was not initiated by the Board of Directors; rather, it appears to have been directed by Company management rather than any subset of independent directors. In addition, the press release characterized the investigation as "independent" without disclosing that the law firm conducting the investigation had previously represented both the Company and the Company's CEO individually. Furthermore, the press release stated that the Board or a group of "Disinterested Directors" had received "regular reports including related to regulatory and governmental communications." This overstated both the degree to which the Company had been in contact with regulatory agencies about the subject matter referenced in the blog post, as well as the involvement of the directors in oversight or direction of the inquiry.

Related to this matter, on January 12, 2017, the Securities and
Exchange Commission ("SEC") issued a formal order of investigation
directed at certain of the issues that the Special Committee is reviewing.
Also on January 12, 2017, the SEC issued a subpoena seeking certain
documents from the Company, primarily relating to the October 18, 2016
press release and associated public statements. The Company intends to
fully cooperate with the SEC; in addition, the Special Committee will
share the results of its review with the SEC staff.

The Company expects to report fourth quarter financial results on
Monday, January 30. The Company currently expects to timely file its
Annual Report on Form 10-K for the year ended December 31, 2016 and
the Company intends to file its unaudited Quarterly Report on Form 10-
Q for the quarter ended September 30, 2016 on or prior to timely filing
its 10-K.

**Changes in Corporate Governance Policies**

The Board is in the process of considering various measures to
enhance its overall corporate governance. The Board has separated the
roles of Board Chair and Chief Executive Officer, effective immediately.
In addition, the Board approved a separation of the Compensation,
Nominating and Corporate Governance Committee into two separate
committees; one focusing on compensation matters and one on
governance matters. At the Board's direction, the Company is in the
process of preparing a more rigorous policy to govern review and
approval of proposed related party transactions. Further changes in
corporate governance may be implemented as the Board continues its
review.

41.    As a result of this news, shares of Banc stock dropped $1.50 per share, to
close at $14.65 per share, a decline of 9% on volume of nearly 6.5 million shares.

42.     Defendants' statements during the Class Period about Banc's success and its governance were false and misleading due to defendants' concealment of Banc's associations with Jason Galanis.

43.     As a result of defendants' false statements, Banc securities traded at artificially inflated prices during the Class Period.   However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending the price of the Company's shares down and causing economic harm and damages to Class members.

## LOSS CAUSATION/ECONOMIC LOSS

44.     During the Class Period, defendants made false and misleading statements by concealing the Company's association with Jason Galanis and engaged in a scheme to deceive the market.  Defendants' conduct artificially inflated the prices of Banc securities and operated as a fraud or deceit on the Class.   Later, when defendants' prior misrepresentations were disclosed to market participants, the prices of Banc securities plummeted, as the prior artificial inflation came out of the prices. As a result of their purchases of Banc publicly traded securities during the Class Period, plaintiff and members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

45.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's shares traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's shares; and

1          (e)     Plaintiff and other members of the Class purchased Banc securities

2  between the time defendants misrepresented or failed to disclose material facts and the

3  time the true facts were disclosed, without knowledge of the misrepresented or

4  omitted facts.

5         46.    At all relevant times, the market for Banc stock was efficient for the

6  following reasons, among others:

7          (a)     Banc stock met the requirements for listing, and was listed and

8  actively traded on the NYSE, a highly efficient and automated market;

9          (b)     As a regulated issuer, Banc filed periodic public reports with the

10  SEC; and

11          (c)     Banc regularly communicated with public investors via established

12  market communication mechanisms, including through the regular dissemination of

13  press releases on the major news wire services and through other wide-ranging public

14  disclosures, such as communications with the financial press, securities analysts and

15  other similar reporting services.

16                                         **NO SAFE HARBOR**

17         47.    Many (if not all) of defendants' false and misleading statements during

18  the Class Period were not forward-looking statements ("FLS") and/or identified as

19  such by defendants, and thus did not fall within any "Safe Harbor."

20         48.    Banc's verbal "Safe Harbor" warnings accompanying its oral FLS issued

21  during the Class Period were ineffective to shield those statements from liability.

22         49.    Defendants are also liable for any false or misleading FLS pleaded

23  because, at the time each FLS was made, the speaker knew the FLS was false or

24  misleading and the FLS was authorized and/or approved by an executive officer of

25  Banc who knew that the FLS was false.  Further, none of the historic or present tense

26  statements made by defendants were assumptions underlying or relating to any plan,

27  projection or statement of future economic performance, as they were not stated to be

28

1  such assumptions underlying or relating to any projection or statement of future

2  economic performance when made.

3                          **CLASS ACTION ALLEGATIONS**

4          50.    Plaintiff brings this action as a class action pursuant to Rule 23 of the

5  Federal Rules of Civil Procedure on behalf of all persons who purchased Banc

6  publicly traded securities during the Class Period (the "Class").  Excluded from the

7  Class are defendants and their families, the officers and directors of the Company, at

8  all relevant times, members of their immediate families and their legal representatives,

9  heirs, successors or assigns, and any entity in which defendants have or had a

10 controlling interest.

11         51.    The members of the Class are so numerous that joinder of all members is

12 impracticable.  The Company's stock is actively traded on the NYSE and there are

13 49.5 million shares of Banc stock outstanding.  While the exact number of Class

14 members is unknown to plaintiff at this time and can only be ascertained through

15 appropriate discovery, plaintiff believes that there are hundreds of members in the

16 proposed Class.  Record owners and other members of the Class may be identified

17 from records maintained by Banc or its transfer agent and may be notified of the

18 pendency of this action by mail, using the form of notice similar to that customarily

19 used in securities class actions.

20         52.    Common questions of law and fact predominate and include: (i) whether

21 defendants  violated  the  1934  Act;  (ii)  whether  defendants  omitted  and/or

22 misrepresented material facts; (iii) whether defendants knew or recklessly disregarded

23 that  their  statements  were  false;  and  (iv)  whether  defendants'  statements  and/or

24 omissions  artificially  inflated  the  prices  of  Banc  securities  and  the  extent  and

25 appropriate measure of damages.

26         53.    Plaintiff's claims are typical of the claims of the members of the Class as

27 all members of the Class are similarly affected by defendants' wrongful conduct in

28 violation of federal law that is complained of herein.

54.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

55.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

56.    Plaintiff incorporates ¶¶1-55 by reference.

57.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

58.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Banc securities during the Class Period.

59.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Banc securities.

Plaintiff and the Class would not have purchased Banc securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

60.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Banc securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act Against All Defendants

61.    Plaintiff incorporates ¶¶1-60 by reference.

62.    During the Class Period, defendants acted as controlling persons of Banc within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about Banc, the Individual Defendants had the power and ability to control the actions of Banc and its employees.  Banc controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding plaintiff and the members of the Class damages and interest;

C.    Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

1

## JURY DEMAND

2          Plaintiff demands a trial by jury.

3    DATED: January 26, 2017                    ROBBINS GELLER RUDMAN
                                                  & DOWD LLP
4                                               DAVID C. WALTON

5

6                                                    *s/ David C. Walton*
                                                 DAVID C. WALTON
7
                                                655 West Broadway, Suite 1900
8                                               San Diego, CA 92101
                                                Telephone: 619/231-1058
9                                               619/231-7423 (fax)

10                                              JOHNSON & WEAVER, LLP
                                                FRANK J. JOHNSON
11                                              PHONG L. TRAN
                                                600 West Broadway, Suite 1540
12                                              San Diego, CA 92101
                                                Telephone: 619/230-0063
13                                              619/255-1856 (fax)

14                                              Attorneys for Plaintiff

15   I:\Admin\CptDraft\Securities\Cpt Banc.docx

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Mark Malak, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.    I have reviewed the complaint with my counsel and authorize its filing.

2.    I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.    I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.    I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 10/4/16 | 1.2867 | 17.424 |
| 8/10/16 | 141 | 22.5258 |
| 7/5/16 | .8648 | 17.3449 |
| 4/21/16 | 125 | 19.112 |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| 10/18/16 | 1 | 11.62 |
| 10/18/16 | .1515 | 11.62 |
| 10/18/16 | 2 | 11.60 |
| 10/18/16 | 2 | 11.60 |
| 10/18/16 | 2 | 11.62 |
| 10/18/16 | 2 | 11.60 |
| 10/18/16 | 2 | 11.60 |
| 10/18/16 | 2 | 11.60 |
| 10/18/16 | 175 | 11.60 |
| 7/18/16 | 80 | 19.778 |

5.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24th day of January, 2017.

DocuSigned by:

Mark Malak